IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BRIAN FLUG, ) | | |
| ) | | |
| Petitioner, ) | | 4:07CV3070 |
| ) | | |
| v. ) | | |
| ) | | |
| CABELA'S, Inc., ) | | MEMORANDUM AND ORDER ON |
| ) | | DEFENDANT'S MOTION FOR |
| Defendant. ) | | SUMMARY JUDGMENT |
| ) | | |

On May 22, 2007, the plaintiff, Brian Flug, filed an amended complaint against Defendant Cabela's, Inc. (Cabela's), alleging violations of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101 et seq.; Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e et seq.; and state law. (See generally Am. Compl., filing 14.) Now before me is the defendant's motion for summary judgment, filing 68. For the following reasons, I find that the defendant's motion must be granted.

**I.   BACKGROUND**

The defendant "is a specialty retailer of hunting, fishing, camping and related outdoor merchandise and is headquartered in Sidney, Nebraska." (Def.'s Statement of Uncontested Material Facts (Def.'s Facts), filing 69, ¶ 1.) On October 24, 2005, the plaintiff began working as a "Storage Manager" in the defendant's Management Information Systems (MIS) department. (Id. ¶ 2.) Generally, it was the plaintiff's responsibility "to work with all of the MIS department to develop a forward-looking policy plan with procedures regarding storage management, disaster recovery and business continuance." (Id. ¶ 3.) At all relevant times, the plaintiff's immediate supervisor was Jon Crowe, and the director of the MIS department was Larry Popps. (Id. ¶ 4.) Anthony Brindisi, Scottie Brown, John Bilyeu, Henry Gutierrez, and Mark Roelle were employed in the MIS department, and they worked with the plaintiff "regularly." (Id. ¶ 5.)

1

Although the plaintiff states that Crowe never criticized his job performance, (see Pl.'s Genuine Issues of Material Fact (Pl.'s Facts), filing 73, ¶ 1 (citing Pl.'s Index, filing 74, Ex. 1, Pl.'s Dep. at 173:17-174:1)), it is undisputed that shortly after he began his employment with the defendant, the plaintiff made an error which caused half of the storage area network to shut down, (see Def.'s Facts ¶ 7). In addition, some of the plaintiff's coworkers complained about the plaintiff's "competency, job performance and workplace behavior." (Def.'s Facts ¶ 8.) These complaints increased during February 2006. (See id. ¶ 9.) More specifically,

> During that month, coworkers complained that Plaintiff had procrastinated on various projects, which resulted in delays to the coworkers' own projects. Additionally, coworkers raised serious concerns that they did not believe Plaintiff possessed the requisite technical competency to effectively perform the basic responsibilities of his job. Lastly, coworkers were uneasy with Plaintiff's workplace behavior, as they had observed him acting irrationally and unprofessionally on multiple occasions.

(Id. (citations omitted).)

On February 9, 2006, the plaintiff met with Ron Myers, the defendant's Senior Human Resource Manager. (Def.'s Facts ¶ 10.) It appears that the plaintiff was referred to Myers through the defendant's Employee Assistance Program hotline. (See Pl.'s Facts ¶ 4 (citing Pl.'s Index, filing 74, Ex. 1, Pl.'s Dep. at 298:9-300:13).) During this meeting, the plaintiff criticized "decisions concerning spending and vendor selection" and stated that "he was being hindered in his ability to do the job he was hired to perform because of the amount of deference given to EMC," a vendor that provided some of the defendant's storage software and equipment. (Def.'s Facts ¶ 10; see also id. ¶ 6.)[1] In addition, there is evidence suggesting that the plaintiff disclosed

---

[1] There is evidence that the plaintiff 1) believed that "unethical spending, based on benefits from vendors," was occurring at Cabela's; 2) learned from someone that Crowe and Popps were "still purchasing equipment as if they were [a] private," as opposed to a public, company; 3) learned from Crowe that Crowe's "intent was to let this thing fail so he can relocate the data center"; 4) "discovered $500,000 in technology waste and developed a plan to correct it," but was rebuffed by Crowe, who stated, "who cares? It is Cabela's money, and I'd only purchase from vendors who come to Sidney to take me out"; and 5) believed that "there was significant unnecessary expenditures [sic] and waste from a storage deployment." (See Pl.'s

his history of alcoholism and chemical dependency to Myers. (Pl.'s Facts ¶ 3 (citing Pl.'s Index, filing 74, Ex. 1, Pl.'s Dep. at 239:1-242:19).) Myers states that he was unable to "discern from Plaintiff what his specific concerns were" during their meeting, but he advised the plaintiff to return for another meeting "if his concerns continued or if he had factual data to support his concerns." (Def.'s Facts ¶ 13.) Myers did not inform Crowe or Popps about his meeting with the plaintiff. (See id. ¶ 14.)

On or about March 8, 2006, Brindisi, Brown, Bilyeu, and Roelle met with Crowe to voice complaints about the plaintiff's "technical competency and conduct." (Def.'s Facts ¶ 15.) More specifically, they felt that the plaintiff lacked "the technical skill or knowledge necessary to perform the essential functions of his position as Storage Manager," and "all were concerned about Plaintiff's behavior in the workplace, based on prior incidents in which Plaintiff exhibited a temper and behaved irrationally." (Id.) After Crowe discussed these complaints with Popps, Crowe and Popps "decided to follow-up on the complaints . . . and take any appropriate employment action warranted by that follow-up." (Id. ¶ 16.)

On March 15, 2006, the plaintiff sent an email to James Cabela, who is one of the defendant's co-founders and directors. (Def.'s Facts ¶ 17.) This email states, in part, as follows (without alterations in spelling and punctuation):

> James:
>
> I may not make it?, the MIS Management is corrupt and not in the best interests for Cableas.
>
> This is a summary of 10 pages of notes:
> - The Cabelas MIS manages are not making decisions in the best interests of Cabelas, unless EMC is mandated from the board of directors
> - The goal is to use up the data center space, raise IT costs and make it to the point of a outsource direction with EMC and Level 3. The MIS manages have spent $.77 on the $1 incorrectly and with

---

Facts ¶ 2 (citing Pl.'s Index, filing 74, Ex. 1, Pl.'s Dep. at 185:5-21; 192:23-193:4; 195:23-196:17; 252:18-23; 258:22-23; 288:1-8).) None of the evidence cited by the plaintiff indicates, however, that the plaintiff presented any of this information to Myers during the meeting of February 9, 2006, or at any other relevant time.

>       no expertise supporting them, they do not invest or trust the people who work for them unless you are part of the goose pit gang.
> - EMC runs the data storage planning in parallel with MIS managers.
> - Product selection for data storage is only with EMC or Forstyhe, due to the hidden agenda of outsourcing, not what is best for Cabelas.
> - Shortly after I started I uncovered a 47% waste in the data storage environment, and this was not good, as it dose not help the hidden agenda of outsourcing.
> - In five years the MIS department investment has produced little to no return on investment.
> - MIS has absolutely no management at all, for example they will ask a plumber a question about an electrical need.
> - They are getting ready to purchase some $450k of EMC storage and they have not used what they correctly, by any stretch, way out to lunch
>
> . . . .
>
> To quote the MIS manages as follows:
> - Who cares we are going to sell out to Dicks Pro Shop
> - Who cares we are going to Out source to Level 3 and move to CO.
> - Who cares Storage is Cabelas money
> - How are we coming with getting rid of Brian L?
> - I spend Cabelas money on IT, for me, because I can
> - If you can out drink me, I will promote you
> - We buy products from vendors who spiff us, regardless of the price or if it is good for Cabelas
> - The Cabelas boys, owe me, I am going to get what I want no matter what
>
> . . . I can see this Enron behavior easily, and we have an Enron based MIS group here at Cabelas
>
> I was hired as the storage manager and the MIS group dose not even acknowledge me as the position I was hired for.

(Def.'s Index, filing 70, Ex. 6, Attach. A.)

Myers and Brian Linneman, who served as the defendant's Vice President and Chief Operations Officer, decided to meet with the plaintiff to discuss this email. (Def.'s Facts ¶ 18.) Myers informed Crowe about this meeting, and Crowe told Myers that he (Crowe) and Popps had met previously to discuss complaints raised by the plaintiff's coworkers. (Id. ¶ 19.) Myers

4

offered to help Crowe and Popps with their "following up on" these complaints.  (Id.)

On March 15, 2006, Myers and Linneman met with the plaintiff, and "Linneman methodically went through Plaintiff's email to Cabela, line-by-line, discussing Plaintiff's concerns and outlining Cabela's position with respect to each."  (Def.'s Facts ¶ 20.)  According to Myers, the plaintiff did not offer any additional information in support of the concerns that he raised in his email.  (Id. (citing Def.'s Index, filing 70, Ex. 1, Myers Aff. ¶ 15).)[2]  Linneman asked the plaintiff "to clearly and fully explain his concerns in writing."  (Id.)  In addition, Linneman and Myers agreed to investigate the plaintiff's complaints.  (Id. ¶ 21.)  Linneman was able to dismiss some of the plaintiff's complaints out-of-hand.  (See id.)  Also, after considering the plaintiff's complaints about unused storage space, Linneman and Myers concluded that the "space had been allocated to future projects and was necessary to support future planned Cabela's technology projects."  (Id. ¶ 28.)

On March 16, 2006, the plaintiff sent an email to Linneman stating, in part, as follows (again, spelling and punctuation are reproduced without alteration):

> I would very much like to offer my expertise as a Storage Profession at Cabelas. However, we will need to address the following items: If we can get answers to the following items, I am golden, and my experience and expertise with be a technology advantage to the Cabelas MIS future.
>
> Would you recommend that I send this to Jon and get his response before we go to the step of us all sitting down in a room together?
>
> Or, how about someone ask Jon / Larry about this from a management standpoint, anonymously, on my behalf.
>
> 1.   If I am the Storage Manager, how come I do not have management support in the Storage solutions for Cabelas?
>
> 2.   With a Storage DR / HA Management title, this requires a methodical, experienced storage management solution to be in place in order for a

---

[2]The plaintiff argues that he made Myers and Linneman aware of the information summarized in footnote 1 above.  (See Pl.'s Facts, ¶ 5.)  As I noted previously, however, the evidence cited by the plaintiff does not indicate that this information was relayed to Myers and Linneman during the meeting of March 15, 2006, or at any other relevant time.  (See supra note 1.)

       successfully Storage DR / HR outcome.  In short a DR / HA Storage future is a byproduct of the storage management solution in place today.  You cannot have one before the other.

3. When an experienced storage person finds an incorrect deployment, how can, or how should this person extend his or hers experience to benefit Cabales Storage solutions unless MIS Management trusts the professional they hire.

4. How can we have a Storage Manager, with no storage department or leadership of responsibilities from MIS management?

5. With the EMC influence for data storage, and a hired experienced Storage Manager, shouldn't this storage professional be involved with planning and direction for data storage at Cables?  A single and efficient storage focal point.

6. With the storage status as it is today, and the fact that you have hired a storage expert, how come you have not embraced the expertise you acquired?

7. If the storage solutions at Cabelas is not collectivity profitable or efficient, why would we keep doing the same thing, and not utilize the newly hired Storage professional to help improve?

8. How can the storage professional offer his / hers expertise if management dose not offer leadership in the MIS storage departments?

9. If we have a Storage Manager, that would imply we have a group for storage resources.  Then, how come storage decisions, requirements and recommendations are still disjointed, unmanaged and done by inexperienced storage people?

(Def.'s Index, filing 70, Ex. 6, Attach. B.)  After reviewing this email, Linneman concluded that the plaintiff's "complaints stemmed from his perception that MIS department management did not sufficiently value his job and that he was not given sufficient authority and discretion." (Def.'s Facts ¶ 22.)

      On March 20, 2006, Myers met with Bilyeu, Brown, Gutierrez, and Roelle to discuss their concerns about the plaintiff, along with the issues that had been raised by the plaintiff. (Def.'s Facts ¶ 23.)  "Gutierrez stated that he was concerned Plaintiff would inadvertently disable

Cabela's," and added that when the plaintiff's "opinion was challenged or when others did not agree with his suggestions," he seemed to go "into a rage." (Id. ¶ 24.) Bilyeu stated that "he was having difficulty working with" the plaintiff and that the plaintiff "was overly sensitive to the presence of outside vendors, including EMC." (Id. ¶ 25.) He added that "[h]e viewed Plaintiff's behavior as alarming" and "did not believe that Plaintiff was competent to perform the work he was hired to complete." (Id.) Brown stated "that Plaintiff had made detrimental changes to the data center, including changing passwords on servers and moving various fiber optic cables, and that on one occasion this had resulted in half of the storage area network being shut down." (Id. ¶ 26.) He also stated that the plaintiff "was incredibly unpredictable and often became extremely angry in team meetings or would change from being completely calm and controlled to angry and obnoxious in a matter of mere seconds when [he] did not get his way on a particular issue." (Id.) Roelle stated that "he did not believe Plaintiff possessed . . . technical competence," and added that "Plaintiff procrastinated on all of his assignments until someone else completed the assignment for him, and that this task usually fell on Roelle." (Id. ¶ 27.) In addition, "Roelle claimed that during the approximately five months that Plaintiff had worked for Cabela's, Roelle's own development plans had been pushed back at least three months because he had to manage Plaintiff's work load in addition to his own." (Id.)

On March 21, 2006, Myers met with Linneman, Popps, and Crowe to discuss his meetings with Bilyeu, Brown, Gutierrez, and Roelle. (Def.'s Facts ¶ 29.) Myers, Popps, and Crowe determined that the plaintiff's employment would be terminated "based on Plaintiff's incompetency and job performance and his lack of fit within his workgroup due to his workplace behavior." (Id.) Later that day, Myers, Popps, and Crowe informed the plaintiff that his employment was terminated, effective immediately. (Id. ¶ 30.) There is evidence that Myers told the plaintiff that he was being terminated because he had been in jail for sixty days. (Pl.'s Facts ¶ 8.)

After leaving his employment with the defendant, it appears that the plaintiff worked for a company called "K Force," but he was terminated from that position a few months prior to the date of his deposition. (Pl.'s Index, filing 74, Ex. 1, Pl.'s Dep. at 62:23-63:3.) In his deposition, the plaintiff testified that a Rick Filippo told him that "Cabela's contacted EMC and contacted

UNISYS and said they needed to get rid of me," which somehow led to his termination from K Force.  (See id. at 62:23-63:22.  See also id. at 65:12-20 ("[M]y boss told me that Rick Filippo told me that Cabela's contacted EMC and UNISYS and said . . . 'Brian's a bad person,' in summary, 'and you have to get rid of him.'").)  The plaintiff also testified that a Micha Milanda of Tech Systems in Minneapolis, Minnesota, told him that Tech Systems "will not work with me anymore, because they called references at Cabela's, and Cabela's gave them a bunch of bad references."  (Id. at 69:13-22.)

On May 22, 2007, the plaintiff filed a four-count amended complaint against the defendant.  (See generally Am. Compl., filing 14.)  Count I alleges that the defendant discriminated against the plaintiff on the basis of his disability in violation of state and federal law.  (See id. ¶¶ 17-19.)  Count II alleges that the defendant made "false and defamatory statements concerning Plaintiff to Plaintiff's potential employers."  (Id. ¶ 20; see also id. ¶¶ 21-24.)  Count III alleges that "[b]y discriminating and retaliating against the Plaintiff when he reported, opposed, and/or refused to carry out actions that he believed to be unlawful under federal and state law and/or unethical, and by terminating Plaintiff for the same reasons, Defendant willfully violated State and Federal Law including those designed to protect whistleblowers."  (Id. ¶ 25; see also id. ¶ 26-27.)  Count IV alleges that the "[d]efendant's intentional conduct caused Plaintiff severe emotional distress."  (Id. ¶ 30; see also id. ¶¶ 28-29, 31.)  On December14, 2007, the defendant moved for summary judgment on each of the plaintiff's claims.  (See filing 68.)  The plaintiff does not oppose the defendant's motion insofar as it pertains to Counts I and IV; however, he argues that the defendant's motion for summary judgment should otherwise be denied.  (See filing 73 at 1.)  My analysis of the defendant's motion is set forth below.

## II.   STANDARD OF REVIEW

A motion for summary judgment shall be granted by the court when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). However, "[t]he district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial." Firemen's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993). If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, then the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," Anderson, 477 U.S. at 257, and "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," id. at 256 (citing Fed. R. Civ. P. 56(e)).

### III. ANALYSIS

As noted above, the plaintiff has not opposed the defendant's motion for summary judgment on Counts I and IV of the amended complaint. Therefore, the defendant's motion will be granted with respect to those counts. It remains to be determined whether summary judgment is appropriate on Counts II and III.

#### A. Count II - Defamation

In Count II of the amended complaint, the plaintiff alleges that the defendant made defamatory statements to the plaintiff's prospective employers. (See Am. Compl., filing 14, ¶¶ 20-24.) Under Nebraska law, four essential elements inhere in defamation claims; specifically, there must be proof of "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." Nolan v. Campbell, 690 N.W.2d 638, 646-47 (Neb. Ct. App. 2004). In support of its motion for summary judgment, the defendant argues, inter alia, that each of the defendant's employees who has been accused of making defamatory

statements about the plaintiff has denied doing so, and that the "[p]laintiff does not have any evidence other than his own beliefs, which are founded on hearsay statements, that such denials are untrue." (Def.'s Br., filing 69, at 36 (citing Def.'s Index, fling 70, Ex. 2, ¶¶ 24-25; id., Ex. 3, ¶ 7).) In opposition to the defendant's motion, the plaintiff refers me to excerpts of his own deposition testimony wherein he states that Rick Fillipo and Micah Milanda told him that someone at Cabela's made negative statements about him. (Pl.'s Facts ¶ 9 (citing Pl.'s Index, filing 74, Ex. 1, Pl.'s Dep. at 62:23-63:22, 65:12-20, 69:13-22, 88:5-16). See also Def.'s Index, filing 70, Ex. 9; id., Ex. 10, Pl.'s Dep. at 279:8-280:17.)

The evidence submitted by the plaintiff consists entirely of inadmissible hearsay. See Fed. R. Evid. 801. It is well established that "[i]nadmissible hearsay evidence alone may not defeat a summary judgment motion." Firemen's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993). Because the plaintiff has failed to come forward with evidence that would be admissible at trial in support of his claim that the defendant made false and defamatory statements about him, I find that the defendant's motion for summary judgment must be granted with respect to Count II of the amended complaint. Cf. Abbott v. Gale, 896 F.2d 323, 326 (8th Cir. 1990) (holding that plaintiff's failure to submit evidence that might establish that the defendant actually made allegedly defamatory statements warranted summary judgment in favor of the defendant).

### B. Count III - Retaliation

In Count III of the amended complaint, the plaintiff alleges that "[b]y discriminating and retaliating against the Plaintiff when he reported, opposed, and/or refused to carry out actions that he believed to be unlawful under federal and state law and/or unethical, and by terminating Plaintiff for the same reasons, Defendant willfully violated State and Federal Law including those designed to protect whistleblowers." (Am. Compl., filing 14, ¶ 25.) Although the amended complaint states that Count III is based upon federal and state law, the parties' briefs indicate that, in fact, the count is based solely on the Nebraska Fair Employment Practices Act (FEPA), Neb. Rev. Stat. § 48-1101 et seq. (See Def.'s Br., filing 69, at 38-47; Pl.'s Br., filing 73, at 9-11

(analyzing Count III as a claim brought pursuant to Nebraska law).)[3]

The FEPA provides, "It shall be an unlawful employment practice for an employer to discriminate against any of his or her employees . . . because he or she . . . has opposed any practice or refused to carry out any action unlawful under federal law or the laws of this state." Neb. Rev. Stat. § 48-1114(3). In order to establish a violation of this section, a plaintiff must first establish a prima facie case for retaliation. See Helvering v. Union Pacific R.R. Co., 703 N.W.2d 134, 148 (Neb. Ct. App. 2005). To do so, he must show that "(1) he . . . was engaging in a protected activity, (2) he . . . suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the adverse employment decision." Id. If the plaintiff establishes a prima facie case, it becomes the defendant's burden "to demonstrate a legitimate, nondiscriminatory basis" for the adverse employment action. Id. at 152. Once the defendant satisfies this burden, the plaintiff must "demonstrate that the proffered basis was merely pretextual." Id. at 153.

In support of its motion for summary judgment, the defendant argues that the plaintiff cannot establish a prima facie case because there is no evidence that the plaintiff engaged in protected activity. (See Def.'s Br., filing 69, at 40-43.) In opposition to the defendant's argument, the plaintiff cites excerpts from his deposition that, he claims, show that he told Myers, Linneman, Crowe, and Cabela about "issues regarding illegal kickbacks, Sarbanes-Oxley violations, violations of federal law in vendor selection for a publicly traded company, potential violations of the company's fiduciary duty to disclose, and what [the plaintiff] perceived to be

---

[3]I note in passing that in order to establish a retaliation claim under Title VII or the ADA (which are cited in the first numbered paragraph of the amended complaint), a plaintiff must show that he engaged in a statutorily protected activity. E.g., Bakhtiari v. Lutz, 507 F.3d 1132, 1136 (8th Cir. 2007); Thomas v. Corwin, 483 F.3d 516, 530 (8th Cir. 2007); Green v. Franklin Nat'l Bank, 459 F.3d 903, 914 (8th Cir. 2006) (citing 42 U.S.C. § 2000e-3(a)). Statutorily protected activities include opposing an employment practice made unlawful under Title VII or the ADA or making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII or the ADA. 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 12203(a). In this case, there is no evidence that the plaintiff engaged in any activity that might have been "protected" under Title VII or the ADA. Therefore, to the extent that Count III is based upon Title VII or the ADA, the defendant is clearly entitled to judgment as a matter of law.

conflict of interest." (Pl.'s Br., filing 73, at 10 (citing Pl.'s Index, filing 74, Ex. 1, Pl.'s Dep. at 185:5-21, 192:2-193:4, 195:23-196:17, 252:18-23, 258:22-23, 288:1-8).) It is true that "an employee's opposition to any unlawful act of the employer, whether or not the employer pressures the employee to actively join in the illegal activity, is protected under § 48-1114(3)." Helvering, 703 N.W.2d at 150. However, the excerpts cited by the plaintiff simply do not establish that the plaintiff raised "issues regarding illegal kickbacks, Sarbanes-Oxley violations," et cetera, with Myers, Linneman, Crowe, or Cabela. Instead, the excerpts indicate only that 1) the plaintiff discussed excess storage with an unspecified person, disagreed with purchases, and formed an opinion that "unethical spending" was occurring, (see Pl.'s Index, filing 74, Ex. 1, Pl.'s Dep. at 185:5-21); 2) an unidentified person told the plaintiff that "even though [the defendant was] a public company, they were still purchasing equipment as if they were private," (id. at 192:23-193:4); 3) the plaintiff "was pressured to buy more equipment," though he concluded that excess storage was available and waste was occurring, (id. at 195:23-196:17); 4) Crowe told the plaintiff that Crowe wanted "to let this thing fail so he can relocate the data center," (id. at 252:18-23); and 5) Crowe responded to the plaintiff's plan to correct "technology waste" by saying, "Who cares? It is Cabela's money, and I'd only purchase from vendors who come to Sidney to take me out," (id. at 288:1-8). I note that many of these excerpts show that the plaintiff learned certain information from others–not that he reported this information to Myers, Popps, Crowe, Linneman, Cabela, or anyone else.[4] Furthermore, it is undisputed that after Linneman asked the plaintiff "to clearly and fully explain his concerns in writing," (Def.'s Facts ¶ 20), the plaintiff responded with an email stating that he would be "golden" if nine specific "items" could be answered, and none of these "items" represents opposition to unlawful conduct. (Def.'s Index, filing 70, Ex. 6, Attach. B.) In short, though it is clear that the plaintiff opposed what he believed to be wasteful expenditures and was dissatisfied with his role in the company, the evidence cited by the plaintiff does not show that the plaintiff opposed "any unlawful act of the employer." Helvering, 703 N.W.2d at 150. Therefore, the plaintiff cannot establish a prima facie case of retaliation under § 48-1114(3).

---

[4] I note too that the plaintiff does not argue that his March 15, 2006, email to James Cabela amounted to protected activity for the purposes of his retaliation claim.

**IT IS ORDERED** that the defendant's motion for summary judgment, filing 68, is granted.

Dated January 28, 2008.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge